**CITY OF GLENN HEIGHTS, Appellant,**

v.

**SHEFFIELD DEVELOPMENT COMPANY, INC., Appellee.**

**No. 10–99–232–CV.**

Court of Appeals of Texas, Waco.

Oct. 24, 2001.

Rehearing Overruled Nov. 28, 2001.

636

Robert F. Brown, Bickerstaff, Heath, Smiley, Pollan, Kever & McDaniel, L.L.P., Dallas, for appellant.

Arthur J. Anderson, Christine Moseley, Winstead, Secrest & Minick, P.C., Dallas, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

GRAY, Justice.

This is a regulatory takings case. The broad issue we must decide is whether the government is required to pay the landowner for the adverse effect of zoning regulations including a temporary morato-

rium. On this issue, based on the facts of this case, we hold the landowner is entitled to payment.

### FACTUAL BACKGROUND

The history of this dispute can be separated into three general time periods. Those three time periods are: 1) prior to the agreement to purchase the property by Sheffield Development Company, Inc. (Sheffield); 2) the due diligence investigation and purchase of the property by Sheffield; and 3) the development moratorium imposed on the property by the City of Glenn Heights. The moratorium was lifted on the date the property was "downzoned"[1] and this suit promptly followed.

### THE PROPERTY PRIOR TO THE AGREEMENT TO PURCHASE

This suit involves approximately 194 acres of land located in the City of Glenn Heights, Ellis County, Texas.[2] The property is part of a tract of approximately 240 acres zoned as Planned Development District 10 (PD 10). The zoning applicable to PD 10 was first accomplished in 1986 by the passage of a city ordinance. The 1986 zoning for PD 10 was for single-family residential uses, consisting primarily of lots of 6,500 square feet. There were some larger lots in the concept plan. Phase–I of PD 10, consisting of approximately 43 acres, has been developed under this concept plan.

In 1995, Glenn Heights adopted a "unified development code" and rezoned all property other than the 14 previously approved planned development districts. PD 10 was one of the 14 planned development

---

1. "Downzoned" is a term used to describe the action of a zoning authority. As used in this case it refers to the city council's decision to zone the property for development requiring larger lots than under the previously approved zoning.

2. It is undisputed that Glenn Heights is a home-rule city and a political subdivision of the State of Texas.

districts not rezoned. The unified development code stated the previously approved planned development district zoning would be carried forth in full force and effect.

### Due Diligence and the Purchase

In the summer of 1996, Sheffield agreed to purchase the undeveloped 194 acres of PD 10 (the property). During the period of time prior to closing, Sheffield actively conducted a due-diligence investigation, including investigating the zoning of PD 10 and the possibility of it being rezoned. Sheffield made inquiries regarding the property and met with officials and employees of Glenn Heights. Sheffield closed the purchase of the property in late 1996.

### The Moratorium on Development

Shortly after Sheffield purchased the property, Glenn Heights enacted a moratorium on the approval of development applications. The purpose of the moratorium was to eliminate the possibility that potentially affected property owners, like Sheffield, would file a plat or development permit application and "lock-in" their respective development rights under the Texas Vested Rights Statute in effect at that time. *See* Act of June 16, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 19, 1997 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966.[3]

The moratorium was initially for a period of 30 days but was extended. There was a factual and legal dispute as to whether the extension of the moratorium lapsed in March of 1997. According to Glenn Heights, the moratorium was extended by the city manager. According to Sheffield, only a vote of the city council could extend the moratorium. During the

period when the moratorium may have lapsed, Sheffield attempted to file a site plan/preliminary plat. It was returned to Sheffield because of the moratorium purportedly in effect at the time. On March 17, 1997, the moratorium was purportedly "extended" by the City Council. Before the March 17, 1997 extension expired, a new moratorium was adopted by the City Council on April 21, 1997. The new moratorium was subsequently extended by the City Council until April 27, 1998.

The moratorium on development of the property was terminated on April 27, 1998, over 15 months after it was originally put into effect. On the same date, the property was downzoned to minimum 12,000 square foot lots.

### The Litigation

Sheffield sued Glenn Heights asserting that the moratorium on all development and then the downzoning of the property:

1) violated due process under the Texas Constitution;

2) violated equal protection guaranteed by the Texas Constitution;

3) violated the Texas Constitution by taking property without compensation; and

4) violated common law rights under the doctrines of promissory estoppel, latches and vested rights.

Sheffield also sought a declaratory judgment that the plat filed during March of 1997, during the time Sheffield contends the moratorium had lapsed, was deemed approved by Glenn Heights' failure to take action on approval of the plat.

■ The parties agreed to bifurcate the trial. In the first phase of the trial, all issues other than damages were tried to

---

**3.** This statute was reenacted in 1999 and is now found in Chapter 245 of the Texas Local Government Code.

the court. The trial court granted Glenn Heights' motion for a directed verdict on the claimed violations of due process, equal protection and violations of common law. The trial court also rendered judgment that the suit for declaratory judgment was not ripe for adjudication.[4] The trial court determined that the downzoning, but not the moratorium, was a taking of Sheffield's property without compensation.

In the second phase of the trial, the issue of damages was submitted to a jury. There was a several month delay between the bench trial and the jury trial. The jury determined the value of the property before downzoning was $970,000 and $485,000 after being downzoned. The trial court rendered judgment for Sheffield for the difference in value, being $485,000, plus prejudgment interest for the period prior to trial other than the delay between the bench trial and the jury trial. The trial court filed findings of fact and conclusions of law. Both parties have appealed.

## THE APPEAL

Glenn Heights' only complaint relates to the determination that there was a "taking" of Sheffield's property. The issue, according to Glenn Heights, is whether by rezoning Sheffield's property, Glenn Heights has taken the property within the meaning of the Texas Constitution. Glenn Heights contends that by rezoning the property, it did not take any property because the rezoning, at the most, reduced the value of the property 38 percent, or approximately $289,920. This issue is brought to us on Glenn Heights' notice of appeal.

Sheffield brings five complaints by way of a separate notice of appeal:

1) That the trial court erred in determining that the moratorium was not an unconstitutional taking under the Texas Constitution;

2) That the trial court erred in its determination that the rezoning substantially advanced a legitimate governmental interest;

3) That the trial court erred in holding the action for declaratory judgment was not ripe;

4) That the trial court erred in refusing to award pre-judgment interest for the period between the date of the bench trial and the date of the jury trial; and

4. The finality of the trial court's judgment is not attacked. But if the trial court simply determined the issue was not yet ripe and did not sever it, the issue remains pending before the trial court. If it remains pending, the judgment did not dispose of all the issues. If the judgment did not dispose of all the issues, it is not final. If the judgment is not final, we do not have jurisdiction of this appeal.

We have examined the judgment to determine our own jurisdiction and determined that the trial court's intent was to render a final judgment disposing of all issues and all parties. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191 (Tex.2001). The trial court's judgment is entitled "Final Judgment." It contains the following language: "All other relief not expressly granted is denied." The trial court and the parties have treated the judgment as final. The judgment was ren-

dered after a bench and jury trial on the merits. From the reporters record it is also clear that the trial court did not intend to come back to this issue at a future date. There is nothing that we have found in the record or judgment that indicates the trial court intended to withhold a final judgment until the issue raised by declaratory judgment was ripe.

We believe that it is clear that in determining that the issue was not ripe and then rendering judgment the trial court intended to fully and finally dispose of all issues as to all parties. In fact, by the clause in the judgment quoted above, the trial court specifically denied the declaratory relief sought by Sheffield on the basis that it was not ripe. We conclude that the judgment is final and we have jurisdiction to decide this appeal.

5) That the trial court erred in admitting evidence of an expert witness on the issue of damages.

We will first address Sheffield's second issue and Glenn Heights' only issue, and then Sheffield's other issues as necessary to the disposition of this appeal.

### FEDERAL v. STATE LAW

As is readily apparent from Sheffield's claims and the issues on appeal, Sheffield asserts rights only under Texas law. Therefore, for purposes of this appeal, interpretations of the United States Constitution by the United States Supreme Court are not binding authority on this court although they may be used as persuasive resources. The initial question we face in using United States Supreme Court and other Federal Court interpretations of the United States Constitution is whether there is any substantive difference between the United States and Texas Constitutions. Regarding the prohibitions against the government from taking property without compensation, there has been relatively little written about the differences between the United States Constitution and the Texas Constitution.

■ In addition to other limits on the Federal government, the constitutional prohibition on the government taking property provides: "..., nor shall private property be taken for public use without just compensation." U.S. CONSTITUTION amend. V. This prohibition has been incorporated through the Fourteenth Amendment to apply to the individual states. *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 586, 41 L.Ed. 979 (1897); *Mayhew v. Town of*

*Sunnyvale,* 964 S.W.2d 922, 933 (Tex. 1998).[5]

The Texas Constitution contains a similar, but yet different, provision. The provision in the Texas Constitution is worded as follows:

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money; ...

TEX. CONST. art. I, § 17. While the clauses in the United States and Texas Constitutions are similar, they are not identical.

■ The language of the current Texas Constitution was changed from earlier versions of the constitution to add additional protections for Texans. In 1890, the Texas Supreme Court noted:

The constitution of 1869 provided that 'no person's property shall be taken or applied to public use without just compensation being made, unless by the consent of such person.' Const. 1869, art. 1, § 14; 2 Pasch. Dig. 1101. The owner's rights in property are better guarded under the constitution of 1876. It declares that 'no person's property shall be taken, damaged, or destroyed for, or applied to, public use without adequate compensation being made, unless by consent of such person.' Const. 1876, art. 1, § 17. * * * In another, later case, decided at the Galveston term, 1889, Justice GAINES, commenting upon the language of the constitution, says: 'Under the provisions of other constitutions, which merely provided

---

**5.** Several of the issues raised in this appeal were thoroughly analyzed and resolved by the Supreme Court in *Mayhew.* For a full understanding of the dispositions of the issues in this case we must repeat some of that analy- sis. Rather than repeating the numerous citations to authority in *Mayhew,* we will, where appropriate, not repeat the citations and limit our citation of authority to the analysis in *Mayhew.*

compensation to the owner for property taken for public use, it had been a question whether or not one whose property was immediately and directly damaged by a public improvement, though no part of it was appropriated, could recover for such damages. * * * The insertion of the words 'damaged or destroyed' in the section [of the constitution] quoted was doubtless intended to obviate this question, and to afford protection to the owner of property by allowing him compensation when, by the construction of a public work, his property was directly damaged or destroyed, although no part of it was actually appropriated.' *Railway Co. v. Meadows,* 73 Tex. [32] 34, 11 S.W. Rep. 145.

*Ft. Worth & R.G. Ry. Co. v. Jennings,* 76 Tex. 373, 13 S.W. 270, 270–271 (1890). Of course, the Texas Constitution may provide greater protections than those provided by the United States Constitution. *See Heitman v. State,* 815 S.W.2d 681, 683 (Tex.Crim.App.1991).

In *Dallas Hunting Club,* another difference between the United States and Texas Constitutions was discussed and explained:

Section 17 of article 1, State Constitution, secures every person against the exercise of the governmental right and power of eminent domain without adequate compensation, and article 5 of the United States Constitution also provides that private property shall not be taken for public use without just compensation. Under both instruments the exercise of the power of eminent domain is regulated. But, so far as the question presented enters this case under the record, the provisions of the state Constitution alone concern us, because there is *no* specific inhibition in the United States Constitution against taking private property in any event until after compensation is paid; whereas, on the other hand, the state Constitution provides that—

"No person's property shall be taken, damaged or destroyed for, or applied to, public use without adequate compensation being made, * * * and when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money."

It is to be observed that the express requirement inheres in this provision for compensation to be first made when property is actually taken for a public use and that this requirement does not obtain when the property is damaged or destroyed for a public use.

*Dallas Hunting & Fishing Club v. Dallas County Bois D'Arc Island Levee Dist.,* 235 S.W. 607, 609 (Tex.Civ.App.—Dallas 1921, no writ). Based on these cases, it cannot be said that there is no difference between the "takings" provision in the two constitutions. *But see Reeves v. City of Dallas,* 195 S.W.2d 575, 583–584 (Tex.Civ.App.—Dallas 1946, writ ref'd n.r.e.).

■ On the other hand, at least one obvious difference in the wording of the takings clauses of the U.S. and Texas Constitutions does not affect the amount of compensation due. As the Austin Court of Appeals stated in 1936:

There is, we believe, no essential difference between "adequate compensation" under our State Constitution, and "just compensation" under the Fifth Amendment to the Federal Constitution. To be adequate the compensation must be "just," and vice versa. The two expressions, when used in this connection, are synonymous.

*State v. Hale,* 96 S.W.2d 135, 141 (Tex.Civ. App.—Austin 1936), *rev'd and reformed in part and as so reversed in part and reformed in part affirmed,* 136 Tex. 29, 146 S.W.2d 731 (1941).

Differences in wording not withstanding, neither Sheffield nor Glenn Heights has argued or presented authority that the differences in wording will directly affect this case. Thus we will use, where appropriate, cases interpreting the United States Constitution on what constitutes a taking as analogous to the prohibition against takings in the Texas Constitution. *Cf. Mayhew,* 964 S.W.2d at 929. In *Mayhew,* the Court concluded it would use the extensive jurisprudential experience of the federal courts on ripeness for any guidance it may yield, citing *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993), which used federal cases analyzing standing.

We should not, however, be understood as holding that in an appropriate case a party could not show that the Texas Constitution requires compensation in circumstances in which the United States Constitution does not. As noted above, at least as far back as 1890, the Texas Supreme Court determined that the Texas Constitution provided more protection than those constitutions, like the United States Constitution, that simply provided compensation for property "taken," as opposed to property that had been "damaged," which would require compensation in Texas.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

 The trial court made extensive findings of fact and conclusions of law. A complaint about the trial court's determination of these facts will be analyzed using traditional legal and factual sufficiency standards. But the ultimate question of whether a zoning ordinance constitutes a compensable taking is a question of law. *Mayhew,* 964 S.W.2d at 932. In resolving this question of law, we consider all of the surrounding circumstances. *Id.* at 933. "While we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property, ... the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Id.* Our review of the question of law is de novo. *Tarrant Regional Water District v. Gragg,* 43 S.W.3d 609, 615 (Tex.App.— Waco 2001, no pet.).

### REGULATORY TAKING CLAIM

 Takings can be classified as either physical or regulatory. *Mayhew* at 933. Physical takings occur when a condemning authority physically occupies an individual's property no matter how slight the invasion. *See Yee v. City of Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992). Sheffield does not claim that Glenn Heights has physically occupied the property. Rather, Sheffield contends that Glenn Heights' zoning decision constitutes a regulatory taking.

 Zoning decisions are vested in the discretion of legislative bodies; courts should not assume the role of a super zoning board. *Mayhew,* 964 S.W.2d at 933. Despite the discretion afforded to legislative bodies, zoning decisions have constitutional restraints. As a general rule, the application of a general zoning law to a particular property constitutes a regulatory taking if the ordinance "does not substantially advance legitimate state interests" or it denies an owner all "economically viable use of his land." *Id.*

Governmental entities have historically argued, as does Glenn Heights, that as long as the regulation significantly advanced a legitimate governmental interest, there is no taking for which compensation must be paid. *See Mayhew,* 964 S.W.2d at 933. Glenn Heights contends, and the district court found, that the "... rezoning of Sheffield's Property substantially advanced a legitimate governmental interest." But the trial court also found that

the downzoning "... unreasonably interfered with Sheffield's rights to use and enjoy its property." These are the ultimate issues which the Supreme Court has directed that we must determine de novo. *Mayhew,* 964 S.W.2d at 933. We first analyze whether Glenn Heights' actions substantially advance legitimate governmental interests before determining whether Glenn Heights' actions unreasonably interfered with Sheffield's rights to use and enjoy its property. *See id.*

SUBSTANTIALLY ADVANCE LEGITIMATE GOVERNMENTAL INTEREST [6]

■ A property regulation must substantially advance a legitimate governmental interest to pass constitutional muster. *Mayhew,* 964 S.W.2d at 933. Sheffield contends the evidence is insufficient to support the trial court's finding that the downzoning substantially advanced a legitimate governmental interest. The essence of Sheffield's complaint is that "the legislative record in the present case contains no stated reasons by the City for the downzoning of the property." That may be true of the "legislative record" as it existed at the time that Glenn Heights voted to downzone the property. But we must look to the record developed at trial.

■ As discussed in *Mayhew,* "a broad range of governmental purposes and regulations" will satisfy these requirements. *Mayhew,* 964 S.W.2d at 934. Specifically, the United States Supreme Court has noted that the following are legitimate governmental interests: protecting residents from the "ill effects of urbanization;" [7] enhancing the quality of life; [8] preservation of desirable aesthetic features; [9] and protecting a beach system for recreation, tourism, and public health. [10] Other courts have determined that the following are also legitimate governmental interests:

6. Glenn Heights argues that Sheffield has waived its complaints about whether the rezoning or the moratorium substantially advances a legitimate governmental interest because these points were not properly identified as error and were improperly briefed. Sheffield's briefs refer to both issues as arising out of a motion for directed verdict. After arguing that the issues were waived, Glenn Heights' brief then goes on to fully respond to the merits of Sheffield's argument, which is that the trial court's judgment regarding these two issues were not supported by the evidence. Sheffield replied to Glenn Heights' waiver argument with an offer to amend its brief by correcting how the issue was phrased, recognizing that it had erroneously referred to the issues as arising from a directed verdict when the trial court had actually ruled after the bench trial on the merits. After a thorough review of the briefs, and considering the liberal construction we are to give them, we do not believe that Glenn Heights did not comprehend the real issue that Sheffield was presenting nor was Glenn Heights in any way mislead by Sheffield's brief. "We have a policy of 'permitting broader points of er-

ror,' 'liberally construing briefing rules,' and relaxing the 'past rigorous requirements as to the wording of points of error' in order to do justice." *Williams v. Khalaf,* 802 S.W.2d 651, 658 (Tex.1990). Accordingly, we overrule Glenn Heights' argument in response to Sheffield's first two issues that Sheffield has waived these issues by having failed to properly brief them.

7. *Agins v. City of Tiburon,* 447 U.S. 255, 261, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980).

8. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 129, 98 S.Ct. 2646, 2661–62, 57 L.Ed.2d 631 (1978).

9. *Id.*

10. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 488, 107 S.Ct. 1232, 1243–44, 94 L.Ed.2d 472 (1987); *Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 169 (4th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992).

preservation of agricultural uses of land;[11] controlling both the rate and character of community growth;[12] and discouraging conversion of open-space land to urban uses.[13] *Id.* Such zoning ordinances benefit "the public by serving the city's interest in assuring careful and orderly development of residential property with provision for open-space areas." *Id.* at 934, *quoting Agins v. City of Tiburon,* 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980).

The trial court made no specific findings of fact that relate to the legal question of whether the downzoning significantly advanced legitimate governmental interest. The evidence presented on this issue is, for the most part, undisputed. Because Sheffield has attacked the legal determination that the downzoning did not substantially advance a legitimate governmental interest, we construe Sheffield's complaint as an attack on implied findings of fact necessary to support the trial court's determination.

Most of the testimony offered by Glenn Heights about the governmental interest being advanced related solely to population density. The testimony indicated that because of the lower density allowed in the development as a result of the downzoning, there would be more open space and less traffic. Also, there would be greater setbacks, fewer school children, "less folks, and less noise...." Less density was Glenn Heights' method to reduce the effects of urbanization and control the rate and character of growth.

Specifically, Glenn Heights estimates were that because the downzoning of the property reduced the potential number of dwelling units from 1,030 to 521, the population in this area would be reduced from 3000 to 1500. When this rezoning was added to the effects of the other rezoning in connection with the comprehensive development plan the population of Glenn Heights would ultimately be reduced from an estimated 31,000 to 25,000. On the other hand, there was evidence that the roads, schools, and public utilities were all designed to accommodate the original population estimates for this area.

Under the Texas Supreme Court's decision in *Mayhew,* concern for such urbanization effects is a legitimate governmental interest. Additionally, the downzoning substantially advances Glenn Heights' interest in protecting the community from the ill effects of urbanization.[14] Glenn Heights also has a legitimate governmental interest in preserving the rate and character of community growth, and downzoning the property substantially advances those interests.

 Accordingly, we hold that on the evidence presented, Glenn Heights' downzoning of the property passes constitutional muster. In making this determination, we do not review the wisdom of Glenn Heights' decision. *Mayhew,* 964 S.W.2d at

---

**11.** *Christensen v. Yolo County Bd. of Supervisors,* 995 F.2d 161, 165 (9th Cir.1993).

**12.** *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield,* 907 F.2d 239, 244–45 (1st Cir.1990).

**13.** *Pompa Construction Corp. v. City of Saratoga Springs,* 706 F.2d 418, 422 (2d Cir.1983).

**14.** The cases have not discussed what evidence must be presented to establish what the "ill effects of urbanization" are, or exactly

how and to what extent the zoning change protects the residents from those effects. Other courts seem to be satisfied with very general statements of the ill effect and the protection the zoning change will accomplish. Because we do not construe Sheffield's brief as attacking this specific aspect of the proof required to establish that the zoning change substantially advanced a legitimate governmental interest, we do not decide that issue.

935. Rather, we are concerned only with whether the decision satisfies constitutional standards. *Id.* Sheffield's second issue is overruled.

## TAKING BY EXCESSIVE ADVERSE IMPACT

■ Our conclusion that Glenn Heights' action substantially advances a legitimate governmental interest does not end the takings inquiry. A compensable regulatory taking can also occur when the government imposes restrictions that either: 1) deny landowners all economically viable use of their property; or 2) unreasonably interfere with landowners' rights to use and enjoy their property. *Id.* Glenn Heights has predicted that if Sheffield can recover on the theory that it has been deprived of its "investment backed expectations," it will "create an unprecedented takings liability standard for Texas cities that most assuredly will effectively foreclose city-initiated rezoning of property that serve the public good, but which frustrate landowners' subjective expectations to have the zoning on their properties remain unchanged."

■ We understand Glenn Heights' concerns, but one "of the purposes of the Takings Clause is to prevent the government from forcing some people to bear public burdens that, in all fairness and justice, should be borne by the public as a whole." *McMillan v. Northwest Harris County Mun. Utility Dist. No. 24*, 988 S.W.2d 337, 342 (Tex.App.—Houston [1st Dist.] 1999, pet. denied) (citing *Dolan v. Tigard*, 512 U.S. 374, 383–384, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994)). Further, in this case, we are not concerned about a landowner's "subjective expectations" because Sheffield had clearly, publicly, and repeatedly expressed the expectation to purchase and develop this property under the then existing zoning restrictions. In fact, Sheffield's expectations were so well known that after Sheffield purchased the property, Glenn Heights promptly invoked a moratorium on development.

## DENIAL OF ALL ECONOMICALLY VIABLE USE

■ A governmental regulation denies the landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless. *Mayhew*, 964 S.W.2d at 935. Determining whether all economically viable use of a property has been denied entails a relatively simple analysis of whether the property has any value after the governmental action. *Id.*

■ It is undisputed that the property has some economic value after being downzoned. Even Sheffield's witnesses opined that the property after being downzoned had a value of $600 to $700 per acre. Accordingly, Sheffield is not entitled to compensation under this theory because Sheffield has not been deprived of all economically viable use of the property.[15]

## UNREASONABLE INTERFERENCE

■ In contrast to the simple value analysis for depriving the owner of all economically viable use of the property, determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires a consideration of two factors: (1) the economic impact of the regulation; and (2) the extent to which the regulation in-

15. We are not presented with the issue of a tract of undeveloped land inside a city which has no "uses" because Sheffield's witnesses opined that the highest and best use after the regulation is an "investment hold." There was no testimony regarding whether the tract could be applied to agricultural or other uses until it was economically practicable to develop.

terferes with distinct investment-backed expectations. *Id.*

**Unreasonable Interference—economic impact**

■ The first factor, the economic impact of the regulation, merely compares the value that has been taken from the property with the value that remains in the property. *Mayhew,* 964 S.W.2d at 935–936. The loss of anticipated gains or potential future profits is not usually considered in analyzing this factor. *Id.* at 936.

With regard to an examination of this factor, the Texas Supreme Court has directed that we compare the value of the property before the regulation to the value of the property after the regulation. *Mayhew,* 964 S.W.2d at 935–936. The trial was bifurcated between the takings issue and, if necessary, the jury's determination of damages. Under the procedural posture of this case we look only to the evidence in the record at the time the trial court made its determination that there had been a taking and do not rely on the jury's subsequent determination that there was a 50 percent decrease in market value of the property as a result of the downzoning.

The trial court made no specific findings of fact regarding the difference in value before and after the downzoning. The trial court did make a "conclusion of law" related to this element: "The April 27, 1998 rezoning of Sheffield's Property had a severe economic impact on Sheffield." Because this is actually a finding of fact rather than a conclusion of law, we will examine the record to determine if it has evidentiary support.

The evidence regarding the effect of the zoning on the value of the property, without regard to lost profits, supports the finding that the downzoning had a severe economic impact on Sheffield. Sheffield's witnesses opined that the difference in value of the property before the downzoning and after the downzoning was a decline of as much as $2,700,000. This would be a decline in value of over 90 percent. Glenn Heights' appraiser estimated a $291,000 decline in value as a result of the downzoning, a decline of 38 percent.

■ We hold that the undisputed evidence of at least a 38 percent decline in the value of the property as a direct result of the downzoning decision is a sufficient adverse economic impact to satisfy the first factor of the unreasonable interference test. To hold otherwise would be to allow the government to take almost 40 percent of the value of property without having to pay compensation, as long as the taking substantially advanced a legitimate governmental interest.

**Unreasonable Interference—investment-backed expectations**

■ The second factor is the investment-backed expectation of the owner. The existing and permitted uses of the property constitute the "primary expectation" of the owner that is affected by regulation. *Mayhew,* 964 S.W.2d at 935–936. The existing uses permitted by law are what shapes the owner's reasonable expectation. *Id.* Courts have traditionally looked to existing uses of property as a basis for determining the extent of interference with the owner's "primary expectation concerning the use of the parcel." *See Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 170 (4th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992) (*quoting Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665). The Texas Supreme Court has told us that knowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations. *Mayhew,* 964 S.W.2d at 936.

Much of the evidence relevant to this issue is undisputed. The trial court made the following findings of fact related to this factor of the unreasonable interference test:

12. The public improvements developed for Phase I were located and sized to allow development of the property in accordance with the requisites of PD 10.

13. Each and every required public facility or service was available as of November 1996 and subsequently, or could have been made available in a fiscally sound manner, to serve the Property in accordance with the PD 10 zoning.

17. The Comprehensive Plan anticipates development of the Property at a density of four to five units per acre.

18. Development of PD 10 with the maximum of 929 lots allowed under Ordinance No. 391–86 [the original zoning ordinance for PD 10] would not have exceeded a maximum density of 4.0 dwelling units per acre.

19. Phase I of PD 10 was developed with a density of approximately 3.9 dwelling units per acre.

20. Ordinance No. 391–86 is consistent with the Comprehensive Plan.

21. Sheffield had knowledge of the existing zoning and Comprehensive Plan at the time of purchasing the Property.

22. In 1996, before making a decision to purchase the Property, Sheffield met on at least three occasions with elected, appointed and employed officials of the City to discuss the possible development of the Property in accordance with PD 10.

23. In 1996, prior to Sheffield's purchase of the Property, these elected, appointed and employed officials never advised Sheffield that PD 10 was inconsistent with the Comprehensive Plan or that a moratorium or City-initiated re-zoning might be instituted as to the Property.

24. On July 18, 1996, Sheffield sent notice to the City requesting notification of any possible changes by the City to the zoning ordinance and comprehensive plan affecting the Property.

25. As of November 1996, and all dates subsequent, immediate development of the Property in accordance with the PD 10 development standards was certain and not speculative.

27. Sheffield purchased the Property on November 16, 1996.

28. In deciding to purchase the Property, Sheffield relied on the fact that there had already been substantial development of Phase I in accordance with the PD 10 zoning as well as the City's representations regarding the validity of the PD 10 zoning.

29. Sheffield's reliance on the existing substantial development in Phase I and the representations of the City officials was in good faith.

30. Sheffield purchased the Property with the expectation of developing the Property in accordance with the then existing PD 10 development standards.

31. During the Fall of 1996, City representatives met in secret to discuss the possibility of imposing a moratorium and changing the zoning of the Property without Sheffield's consent and/or knowledge.

32. The City Council met in executive session on December 16, 1996, to discuss the possibility of enacting a moratorium on development permit applications and the possibility of undertaking city-initiated rezoning of all planned development zoned properties in the City, including the Property.

33. The City intentionally refused to give Sheffield advance notice of the en-

actment of the moratorium and the possibility of rezoning the Property.

The evidence is undisputed that everyone on the city council knew that Sheffield's purpose in purchasing the undeveloped portion of PD 10 was to develop it in compliance with the then existing zoning regulations. A master plan of the fully developed PD 10 already existed. The utility services and streets had been planned, constructed, and "stubbed out" in the undeveloped portion of PD 10 based upon that zoning. During the due diligence, Sheffield reviewed the unified development code and the comprehensive plan and determined that the existing zoning was in conformity with both of them. Sheffield presented expert testimony that there was no conflict between the then existing PD 10 zoning with primarily 6500 square foot lots and the unified development code which planned for a density of 4 to 5 houses per acre, because as planned there could be no more than 929 houses on the 240 acres in PD 10, a density of roughly 3.9 houses per acre. Sheffield's confidence in the ability to develop under the then existing zoning was strengthened by the fact that 43 acres of PD 10 had already been developed under that zoning (primarily 6500 square foot lots). The 43 acres also had a density of approximately 4 houses per acre.

Additionally, in all of the due diligence, no one ever advised Sheffield that the city council was anticipating downzoning the undeveloped portion of PD 10. Although individual members of the council discussed their desire for larger lots, no one ever stated that a detailed site plan conforming with the existing zoning would not be approved, or that Glenn Heights planned to downzone the property.

The land planning expert for Glenn Heights, in attempting to explain why different densities of zoning were desirable, gave the following testimony: "All you have to do is allow an appropriate choice and then the development community comes in and chooses those districts it wants to develop under. You don't have to have every district. You just have to have appropriate choices." This was clearly what Sheffield was attempting to do. Sheffield identified an area with a particular zoning. Sheffield determined there was a sufficient demand at that location for the housing that was compatible with that zoning. Sheffield purchased the property with the specific intent to develop it as it was then zoned. But the downzoning of the property interfered with, indeed prevented, Sheffield from developing the property as planned.

 Interference with development plans alone, however, is not adequate to establish an unconstitutional taking. The regulatory interference must be unreasonable. We construe this to mean that in addition to actual interference with expectations regarding planned uses, there must be more than a nominal effect on the planned uses. In this case we look, not at the diminution in value as determined by the jury, but the evidence presented on which the determination was made that the downzoning deprived Sheffield of its investment-backed expectations and unreasonably interfered with Sheffield's rights to use and enjoy its property.

 Normally in a condemnation case, because the issue is the value of the property taken, lost profits are of no concern to the court or the fact finder. *State v. Travis,* 722 S.W.2d 698 (Tex.1987). This is no different in a regulatory takings case for purposes of determining the value of the property interest taken. But in analyzing the extent of the interference with the right to use and enjoy its property, particularly as it impacts the developer's investment-backed expectations, we be-

lieve that evidence of the developer's plans and market analysis, including loss of projected profits, should be considered. It is critical, however, to distinguish that this evidence is relevant only to the issue of determining whether the extent of the interference was unreasonable, and not for purposes of determining the amount of compensation due. The condemning authority has to pay only for what it takes, not the lost profits that the owner could have made if allowed to retain the property.

The record in this case contains various cost estimates to complete the improvements in the development and estimates of the sales prices of the lots as originally zoned. There is also testimony regarding a lack of demand for the larger lots after the downzoning. Sheffield estimated the expected profit for the development as originally zoned was $8,300,000. The evidence presented by Sheffield was that the highest and best use of the property after the downzoning was to hold the property until there was a sufficient demand in the area to support the development on the larger lots.

In response to this evidence, Glenn Heights challenged some of the assumptions leading to the estimates but did not challenge that the property would have been developed under the higher density and that it would have generated more income for Sheffield. Glenn Heights' appraiser rejected any effort to analyze the development potential of the property with 12,000 square foot lots instead of 6,500 square foot lots. But he did provide a succinct view from the developer's point of view. He testified:

> ... the developers are going to develop the most dense development that

they're allowed for the lowest cost so they can maximize profits. They're not doing it to ensure the diversity of the city. You're in business—you're in business to make money.

This appraiser had performed no study on the market demand for 12,000 square foot lots. This was in part because there was no subdivision with 12,000 square foot lots in Glenn Heights. He expressed his belief that a development with 12,000 square foot lots would sell as follows: "Because if the product is offered, in my opinion, they'll buy it."

Glenn Heights also presented evidence that as a developer, Sheffield knew that the zoning could be changed by a vote of the city council. In essence, Glenn Heights argues that in the long term every expectation is subject to change because circumstances are subject to change. But the fact that it can be changed is not the issue. We have already determined that Glenn Heights can make the zoning change. The issue is whether Glenn Heights has so interfered with Sheffield's investment-backed expectations that it must compensate Sheffield as a result of the zoning change.

*Mayhew* instructed us to consider all the facts and circumstances to determine whether the interference is unreasonable. Thus, we also consider whether there would otherwise be a negative impact on the governmental entity because of the drain on, or overload of, government services. A review of the evidence reveals that the infrastructure in the area had originally been planned and constructed to support the original zoning. Thus the existing infrastructure and services would not be burdened beyond their design if the property had not been downzoned.[16]

16. We note that this is consideration of the potential impact on Glenn Heights and not just the impact on Sheffield. As we interpret *Mayhew,* because we are to consider all the

■ Based on a review of all the facts and circumstances, we hold that the downzoning of the property from 6,500 square foot lots to 12,000 square foot lots, unreasonably interfered with Sheffield's investment-backed expectations.

In conclusion, the downzoning meets both factors of the test to determine if Glenn Heights unreasonably interfered with Sheffield's right to use and enjoy the property. Accordingly, we hold that Glenn Heights is liable for the adverse effect of the downzoning on the value of the property. The jury determined the decrease in value of the property as a result of the downzoning was $485,000. Neither party has directly attacked this determination on appeal. Therefore, Sheffield is entitled to compensation for the damage to the property as determined by the jury. Glenn Heights' only issue is overruled.

We note that this case is dramatically different than *Mayhew* in several respects. In *Mayhew*, the Town of Sunnyvale was uniquely rural in an otherwise urban area. In this case, the trial court found Glenn Heights was already urban in character. The property at issue in *Mayhew* had been acquired and used for agricultural purposes for many years rather than simply being a part of a planned but unfinished development as in this case. In *Mayhew*, Sunnyvale refused to upzone the property allowing for greater density than one dwelling per acre as it was currently zoned. In essence, Sunnyvale refused to change existing zoning that would allow a much greater population density. In *Mayhew*, the Court emphasized that it was not reasonable for the landowner to expect to obtain such a dramatic upzoning change given the historical use of the property. Glenn Heights did just the opposite. Rather than leave the existing zoning in

place, Glenn Heights insisted on changing the zoning, requiring less density and thus, dramatically changing the economics of developing the property. As more fully discussed above, it is these differences which account for the difference in outcome between *Mayhew* and this case.

### MORATORIUM AS A TAKING

Sheffield argues that a portion of the moratorium imposed by Glenn Heights on development constituted a separate and compensable taking. Sheffield is careful to note that not all moratoriums are compensable takings but contends that the moratorium on all development from April 21, 1997 to April 27, 1998 was unreasonable in scope and duration and was for an improper purpose.

■ A moratorium on development is another type of governmental regulation that must comply with the same constitutional safeguards as discussed at length above for zoning regulations. The moratorium on development is a different taking claim than the downzoning. During the moratorium, Sheffield could not pursue any development of the property. And while the downzoning was designed to achieve certain objectives as fully discussed above, the moratorium was instituted for an entirely different purpose, and accordingly the moratorium must independently satisfy the same constitutional safeguards that applied to the downzoning.

Sheffield concedes that the stated reasons for initially enacting a moratorium on all development would meet the test of substantially advancing a legitimate governmental interest. Sheffield's complaint is that the reason for continuing the moratorium on development had nothing to do with the legitimate reason to enact the

facts and circumstances to determine the reasonableness of the interference, this necessar-

ily includes consideration of the impact on Glenn Heights.

moratorium in the first instance. We agree.

■ Glenn Heights argues that *Crownrich* and its progeny stand for the proposition that they can enact a moratorium on development pending the zoning changes. In *Crownrich,* the Tyler Court of Appeals held the Dallas City Council could "... enact a resolution prohibiting the further granting of building permits pending consideration of the question of rezoning." *City of Dallas v. Crownrich,* 506 S.W.2d 654, 659 (Tex.Civ.App.—Tyler 1974, writ ref'd n.r.e.). With the holding in *Crownrich* we have no argument. But a *Crownrich* type moratorium cannot be extended without fulfilling the same constitutional safeguards as when it was enacted.

■ To avoid having to pay compensation due to the adverse effect a regulation has on the value of property, the first test that the regulation must pass is that the regulation must substantially advance a legitimate governmental interest. *Mayhew,* 964 S.W.2d at 934. "Several Texas courts have recognized that governmental entities cannot act to gain an unfair advantage [over the property owner] by imposing restrictions or prohibitions on the use of property...." *City of Houston v. Kolb,* 982 S.W.2d 949, 957 (Tex.App.—Houston [14th Dist.] 1999, pet. denied). The first court in Texas to fully discuss and develop this concept was the San Antonio Court of Appeals. *See San Antonio River Authority v. Garrett Bros.,* 528 S.W.2d 266 (Tex. Civ.App.—San Antonio 1975, writ ref'd n.r.e.). As the Court explained:

It is clear that in exercising the police power, the governmental agency is acting as an arbiter of disputes among groups and individuals for the purpose of resolving conflicts among competing interests. This is the role in which government acts when it adopts zoning ordinances, enacts health measures, adopts building codes, abates nuisances, or adopts a host of other regulations. When government, in its role as neutral arbiter, adopts measures for the protection of the public health, safety, morals or welfare, and such regulations result in economic loss to a citizen, a rule shielding the agency from liability for such loss can be persuasively defended, since the threat of liability in such cases could well have the effect of deterring the adoption of measures necessary for the attainment of proper police power objectives, with the result that only completely safe, and probably ineffective, regulatory measures would be adopted. But where the purpose of the governmental action is the prevention of development of land that would increase the cost of a planned future acquisition of such land by government, the situation is patently different. Where government acts in this context, it can no longer pretend to be acting as a neutral arbiter. It is no longer an impartial weigher of the merits of competing interest among its citizens. Instead, it has placed a heavy governmental thumb on the scales to insure that in the forthcoming dispute between it and one, or more, of its citizens, the scales will tip in its own favor. The social desirability of leaving government free to seek its own enrichment at the expense of those whom it governs under the guise that it has the power to regulate harmful conduct is not readily apparent. *See* Sax, Takings and the Police Power, 74 Yale L.J. 36 (1964). To permit government, as a prospective purchaser of land, to give itself such an advantage is clearly inconsistent with the doctrine that the cost of community benefits should be distributed impartially among members of the community. The prohibition against uncompensated takings was 'de-

signed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

To hold a governmental agency liable under the facts of this case will not cause the heavens to fall, nor will it transform government into a giant shackled into inactivity by the fear of potential liability. It will still be free to enact zoning ordinances, building codes, health regulations, traffic laws, etc. In brief, it will still be able to 'govern' without fear of financial disaster. The only result will be that it will not be able to 'rig' the market in its favor. That is, government will merely be discouraged from giving itself, under the guise of governing, an economic advantage over those whom it is pretending to govern. *San Antonio River Authority,* 528 S.W.2d at 273–274.

The Texas Supreme Court has relied on this holding and favorably quoted from the San Antonio Court's discussion. *State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994). The Court stated "The court of appeals, by recognizing the cause of action, sought to discourage government from wielding its power to 'rig' the market in its favor." *Id.* As indicated above, Sheffield contends Glenn Heights did not extend the moratorium for a legitimate reason.

The trial court made findings of fact relevant to the moratorium as follows:

31. During the Fall of 1996, City representatives met in secret to discuss the possibility of imposing a moratorium and changing the zoning of the Property without Sheffield's consent and/or knowledge.

32. The City Council met in executive session on December 16, 1996, to discuss the possibility of enacting a moratorium on development permit applications and the possibility of undertaking city-initiated rezoning of all planned development zoned properties in the City, including the Property.

33. The City intentionally refused to give Sheffield advance notice of the enactment of the moratorium and the possibility of rezoning the Property.

34. On January 6, 1997, the City Council enacted Resolution No. 287–97, which provided for a 30–day moratorium until February 6, 1997, on the acceptance and filing of preliminary plat applications on all properties zoned as planned developments.

35. On January 6, 1997, the City Council approved a contract with Dunkin, Sefko & Associates, Inc. to review the planned development districts in the City.

36. Dan Sefko's preliminary recommendations regarding the possible rezoning of the planned developments in the City, dated January 24, 1997, were presented to the City Council on February 3, 1997.

37. One of Dan Sefko's January 24, 1997, recommendations was for the Property to be rezoned to an SF–2 District requiring minimum 12,000 square foot lots.

38. On February 3, 1997, the City Council voted to extend the moratorium for thirty more days until March 6, 1997.

45. At its March 24, 1997, meeting, the Planning and Zoning Commission voted 4–3 not to follow Dan Sefko's recommendation to rezone the Property.

46. A March 26, 1997, memorandum from the City Manager was delivered to the City Council members advising City Council to delay taking action on the zoning of the Property because a 3/4th's

vote of the Council could not be obtained to follow Dan Sefko's recommendation.

47. The City Council voted to extend the moratorium on March 31, 1997.

48. The April 17, 1997, report from the Planning and Zoning Commission to the City Council recommended that the PD 10 zoning of the Property not be changed.

49. The April 21, 1997, memorandum from the City Manager to the City Council recommended that the City Council postpone voting on the zoning of the property.

50. At the April 21, 1997, meeting, the City Council enacted Resolution No. 292-97 to enact a new moratorium for 90 days until July 21, 1997.

51. At the April 21, 1997, meeting, the City Council approved Dan Sefko's recommendation for PD Nos. 4, 5, and 7, and tabled PD Nos. 2, 3, 8, 9 and 10, and returned them to the Planning and Zoning Commission for further consideration, in accordance with the recommendation of the City Manager.

52. On July 7, 1997, the moratorium was again extended by City Council Action, this time for another 163 days, until December 31, 1997.

54. On March 30, 1998, the City Council extended its moratorium until May 15, 1998.

57. On April 27, 1998, a joint Planning and Zoning/City Council public hearing was held on the zoning of the Property.

58. At the April 27, 1998, hearing, the City Council reviewed no written material supporting or justifying rezoning the Property to the SF-2 District, except for Dan Sefko's January 24, 1997, recommendation.

59. On April 27, 1998, the Planning & Zoning Commission voted to recommend rezoning the Property to a Planned Development District with SF-2 District development standards.

60. The Planning & Zoning Commission did not prepare or forward a report on its April 27, 1998, zoning recommendation to the City Council.

61. The City Council unanimously adopted the Planning and Zoning Commission recommendation on April 27, 1998, by enacting Ordinance No. 641-98.

The initial moratorium was passed shortly after Sheffield purchased the property. The purposes for the initial moratorium were stated in the resolution. The stated reasons were basically to study the existing zoning and determine if it needed to be changed. The city engaged a city planner who promptly prepared and submitted his report to the city's planning and zoning committee. The report recommended the downzoning. The planning and zoning committee voted to reject the planner's recommendation and recommended that the city council leave the zoning on the property unchanged. A two-thirds vote of the city council was required to implement a zoning resolution contrary to the recommendation of the planning and zoning commission.

When the rezoning of the property came before the city council, it was recognized that there were not enough votes to override the planning and zoning commissions recommendation. The council voted to table the vote on rezoning the property.

The mayor of Glenn Heights testified that the moratorium was suggested by Council Member Humphrey to increase the city's bargaining position with Sheffield. The Mayor testified:

A. Well, I would say that probably—it probably came up with Councilman Humphrey in discussions that, you know, we were—we were negotiating from a weak position and that if we

would go ahead and move on that process, then we would be in better shape negotiating early on in the discussions with Sheffield.

Q. When did you have this conversation with Council Member Humphrey?

A. Like I—all I can say, it would probably be early on when we first started that he had—he had a concern that he voiced of, you know, negotiating from a weak position and, you know, just asking for improvements instead of being in a position to do more than just ask.

\* \* \*

Q. So clearly, though, by the August 31st date of the memo when you distributed this to all of the members of the Council, he had expressed his concern that the City did not have enough leverage, as he likes to put it, over the developer?

A. I think that would be a fair statement.

Council Member Humphrey characterized the moratorium as a way to "... force both sides to look at this particular tract of land, ...."

Glenn Heights had a legitimate interest of maintaining the status quo while studying the situation. But once the council had all the information it needed regarding the study of the zoning issue, there was no need to further delay a vote on the downzoning issue.

Council member Humphrey candidly conceded in his testimony that the council was at a stalemate regarding the rezoning of the property. Humphrey was specifically asked why the council had not voted on the rezoning of PD 10. He responded:

A. ... the main reason I think is because the Mayor does not feel comfortable with doing it, and because of that—subsequently, because of that, there are

two members that are going to follow him mindlessly. And so we don't have the votes to do anything with it except just stalemate.

\* \* \*

Q. So you're basically saying that there's a stalemate on the Council with regard to rezoning this property?

A. As far as rezoning it to something specific, yes.

Glenn Heights sought to justify its actions by introducing evidence of the negotiations with Sheffield about possible changes to the zoning of PD 10. Glenn Heights also introduced evidence that the planning and zoning commission had several other tracks that also had to be reviewed, established that none of the members of the zoning commission or city council were paid for their service, and that due to the relatively small community it was not practicable to resolve the zoning on PD 10 any earlier than April 27, 1998.

The protracted negotiations with Sheffield regarding the zoning provide no evidence that the delay was needed to fulfil the legitimate purposes of the moratorium. Rather, this evidence tends to reinforce Sheffield's claim that Glenn Heights imposed the moratorium for an improper purpose, which was to increase the strength of its negotiating position during the period of negotiation with Sheffield in which it was then engaged. It was only because of the moratorium that Sheffield had to engage in these negotiations.

As for the need for time to consider the zoning on other tracts, this testimony provides no evidence of why PD 10, which obviously had a development stymied, could not have been considered and voted on at the appointed time, April 21, 1997. By this date, the Council had all the information it needed to decide whether it wanted to downzone the undeveloped por-

tion of PD 10. The finding of the trial court that "the City Council reviewed no written material supporting or justifying rezoning the Property to the SF–2 District, except for Dan Sefko's January 24, 1997 recommendation" resolves the factual issue that the City Council did not need any additional information before making its decision. Glenn Heights does not attack this factual determination made by the trial court. Further, there is no evidence that the need for other studies or reports was considered and rejected.

■ From the testimony recited above, the motivation for the moratorium was never simply to study the zoning issue. But Sheffield recognizes that the stated purposes of the moratorium, even if mixed with other motives of some of the council members, does not constitute an unconstitutional taking of his property. See generally Crownrich, supra. We hold that once the city had all the information it needed to make a decision, the stalemate on the council was not a legitimate reason to continue the moratorium which prevented development of the property, accordingly the moratorium after April 21, 1997 did not substantially advance a legitimate governmental interest.

Sheffield's first issue is sustained. The trial court's judgment holding that the moratorium substantially advanced a legitimate governmental interest is reversed. The issue of damages owed to Sheffield due to the moratorium preventing all development of the property is remanded to the trial court for determination. This is an entirely different damage analysis than for the downzoning. Just as the takings claim must stand independently, so also must the damage analysis. While the parties and the trial court must look to the existing case law for guidance on the appropriate measure of damages, if any, from the moratorium, we note that care must be used to avoid duplication of damages.

### DECLARATORY JUDGMENT

Sheffield next complains that the trial court erred in holding the action for declaratory judgment was not ripe. Sheffield contends because the moratorium had expired it is entitled to a determination of whether or not the site plan/preliminary plat was approved by the city's failure to affirmatively reject it within the time required. We agree.

The trial court made the following findings of fact related to declaratory judgment requesting a determination regarding approval of the preliminary plat:

39. On March 6, 1997, the moratorium expired because it had not been extended by the City Council.

40. The City's moratorium was not in effect from March 6, 1997 to March 17, 1997.

41. On March 11, 1997, Sheffield submitted a site plan/preliminary plat application for the Property at the City Secretary's Office addressed to the Mayor.

42. On March 13, 1997, the City Secretary returned the site plan/preliminary plat application to Sheffield by U.S. Mail, with notification it had been rejected solely because of the moratorium established by Resolution No. 287–97.

The trial court's conclusion of law related to this issue is as follows:

78. Sheffield's declaratory judgment causes of action are not ripe for adjudication.

Notwithstanding the trial court's findings of fact, the court granted Glenn Heights' motion for a directed verdict, concluding that the issue was not ripe for adjudication. After the trial court determined the issue was not ripe for adjudica-

tion, the trial court refused to admit additional evidence on the issue. Accordingly the record on this issue was not fully developed.

 An issue is ripe for determination when its resolution does not depend on contingent or hypothetical facts. *Patterson v. Planned Parenthood of Houston and Southeast Texas, Inc.,* 971 S.W.2d 439, 443 (Tex.1998). In determining whether an issue is ripe for decision:

> we consider whether, at the time a lawsuit is filed, the facts are sufficiently developed "so that an injury has occurred or is likely to occur, rather than being contingent or remote." Thus the ripeness analysis focuses on whether the case involves "uncertain or contingent future events that may not occur as anticipated or may not occur at all." By focusing on whether the plaintiff has a concrete injury, the ripeness doctrine allows courts to avoid premature adjudication, and serves the constitutional interests in prohibiting advisory opinions. A case is not ripe when determining whether the plaintiff has a concrete injury depends on contingent or hypothetical facts, or upon events that have not yet come to pass.

*Waco Independent School Dist. v. Gibson,* 22 S.W.3d 849, 851–852 (Tex.2000) (internal citations omitted).

 There is nothing else that can occur that will affect Sheffield's entitlement to a determination of this issue. All the facts necessary to a decision have already occurred. If the plat was approved by the city's default, as contended by Sheffield, Sheffield is entitled to develop the property pursuant to the plat. He is entitled to that determination. We sustain Sheffield's third issue and, because the trial court limited the introduction of evidence on the issue based on its determination that the issue was not ripe, we remand this issue to allow the evidence to be fully developed for the trial court's consideration of the claim for declaratory judgment.

### PREJUDGMENT INTEREST

Sheffield next complains that the trial court erred in refusing to award prejudgment interest for the period between the date of the bench trial and the date of the jury trial. It appears the court declined to impose prejudgment interest based upon Section 304.108 of the Texas Finance Code. The section provides:

> § 304.108. Accrual of Prejudgment Interest During Periods of Trial Delay
>
> (a) In addition to the exceptions provided by Section 304.105, a court may order that prejudgment interest does not accrue during periods of delay in the trial.
>
> (b) A court shall consider:
>
> > (1) periods of delay caused by a defendant; and
> >
> > (2) periods of delay caused by a claimant.

TEX. FIN.CODE ANN. § 304.108 (Vernon Supp.2001).

The statute gives the trial court discretion to suspend the award of prejudgment interest under specified circumstances. In this case, there is nothing to suggest that the period of delay was caused by either party. The trial court specifically stated on the record that he was not available to immediately start the jury trial because he had been assigned to fill Judge Wittig's trial bench because Judge Wittig had been elected to the court of appeals.

 Additionally, interest from the date of the taking has been held to be part of the damages due the property owner in condemnation proceedings. *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 738 (1941). In *Hale,* the Supreme Court affirmed the Austin Court of Appeals determination

that prejudgment interest was part of the damages the property owner was entitled to under the constitution. *See State v. Hale*, 96 S.W.2d 135 (Tex.Civ.App.—Austin 1936). Accordingly, we sustain Sheffield's fourth issue and hold that the trial court erred in not awarding prejudgment interest for the entire time from the date of the taking until the date of the judgment.

### EVIDENCE OF VALUE

Sheffield's next complaint is that the trial court erred in admitting the testimony of Glenn Heights' appraiser. Sheffield contends that because the appraiser testified to the value of the property after the downzoning based upon lot sizes smaller than the lots authorized in the downzoning, the evidence was incompetent under the common law, irrelevant under rules 401 and 402, and not appropriate "expert" testimony under rule 702, and for all these reasons should have been excluded. Glenn Heights contends that Sheffield waived his objections by failing to timely object.

Sheffield challenged the appraiser's testimony out of the presence of the jury. Glenn Heights argued that making an appraisal based upon anticipated changes in zoning was an accepted appraisal technique. The trial court sustained Sheffield's complaint and instructed the witness that the testimony he could give was limited to the value of the property based on the lot sizes after the downzoning. During direct examination, Glenn Heights' counsel carefully avoided any discussion of the lot sizes on which the appraiser's testimony was based. On cross-examination it became clear that the appraiser's estimate of the value of the property was based on lot sizes smaller than the lots authorized after the downzoning.

This was the type testimony the trial court had instructed counsel and the witness that the witness could not give. Having established that the witness had violated the trial court's instruction, the testimony was subject to being stricken from the jury's consideration. But Sheffield failed to move to strike the valuation testimony which was at that time already in evidence for the jury's consideration.

In order to preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion, state the specific grounds therefor, and obtain a ruling. TEX.R.APP. P. 33.1(a). The jury had already heard the testimony without it being apparent to the trial court or the jury that it was based on lot sizes that were smaller than the existing zoning allowed. Once Sheffield established that the evidence already admitted appeared to violate the trial court's instruction, it was incumbent on Sheffield to bring this to the trial court's attention so that the trial court could take corrective action if necessary. *See Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991).

At the time that the testimony came into evidence it was not apparent that it may violate the trial court's instruction. But the trial court was not required to strike the evidence on its own motion, even if the trial court believed that it violated his earlier instruction. Sheffield failed to direct the trial court's attention to the evidence it contends was admitted in violation of the earlier instruction and move to strike it from consideration by the jury. Accordingly, Sheffield has waived the right to complain on appeal about the jury's ability to consider this testimony. Sheffield's fifth issue is overruled.

### CONCLUSION

We affirm the trial court's judgment that Glenn Heights' decision to downzone Sheffield's property substantially advanced a legitimate governmental interest, but it

also unreasonably interfered with Sheffield's right to use and enjoy the property. Accordingly, Glenn Heights must pay Sheffield compensation for damage to the property as determined by the jury. We reform the judgment to award prejudgment interest at 10 percent from April 27, 1998, until the date of the trial court's judgment. We reverse the judgment that the moratorium on development from April 21, 1997, to April 27, 1998, substantially advanced a legitimate governmental interest and render judgment that Glenn Heights must compensate Sheffield for this temporary taking of the property and remand the issue of damages for the temporary taking of Sheffield's property during this period to the trial court for further proceedings. Additionally, we reverse the trial court's determination that the action for a declaratory judgment is not ripe and remand this issue to the trial court for further proceedings.

VANCE, J., concurs and dissents.

VANCE, Justice, concurring and dissenting.

I agree with the majority's analysis of the effect the adoption of the revised zoning ordinance had on the landowner's property. I disagree with other parts of the opinion.

### RE-ZONING AND PREJUDGMENT INTEREST

Based on the issues presented to us, I join that part of the majority opinion upholding the award of compensation for damages due to the re-zoning of the property by the ordinance of April 27, 1998, plus prejudgment interest from that date. I disagree with the "conclusion" that "affirms" part of the judgment, reverses part, and remands the cause for more proceedings. Affirming the judgment for damages will be the "law of the case" not subject to change by the trial court. *Hudson v. Wakefield,* 711 S.W.2d 628, 630

(Tex.1986); *see also Thomas v. Collins,* 860 S.W.2d 500, 502 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (El Paso Court of Appeals' reversal of trial court's dismissal on the pleadings in a transfer case was "law of the case" and binding on trial court on remand). In light of other considerations I will discuss hereafter and in light of the fact that the cause is being remanded for further proceedings, I would simply rule on the issues presented without affirming that part of the judgment. On remand the trial court's hands would not be tied.

### MORATORIUM

I also disagree with that part of the opinion that remands for trial an "issue of damages" due to the moratorium. The opinion renders judgment that the moratorium did not, as a matter of law, substantially advance a legitimate governmental interest. Acknowledging the validity of *City of Dallas v. Crownrich,* the majority nevertheless ignores its teachings. *City of Dallas v. Crownrich,* 506 S.W.2d 654 (Tex. Civ.App.—Tyler 1974, writ ref'd n.r.e.). Under these facts, I would follow *Crownrich* and deny any recovery based on the moratorium period.

Furthermore, if the actual re-zoning of the property substantially advanced a legitimate governmental interest, as we find and as the trial court found, then under these circumstances the moratorium achieved the same result. The majority would be on more sound footing by finding that the moratorium was valid, then applying the *Mayhew* analysis to determine if, as in the case of the re-zoning itself, the moratorium unreasonably interfered with Sheffield's right to use and enjoy the property. *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex.1998).

The majority faults the city council for not voting "once the city had all the infor-

mation it needed to make a decision," specifying that date as April 21, 1997. On that date, however, the council returned the issue to P & Z for further consideration. Does the majority hold that April 21 was the date of another "taking" of another interest in the property? Little guidance is provided about when or how much compensation Sheffield is due for the "damaging by moratorium." Even assuming that the majority is correct in deciding that the property was "damaged" by the moratorium of April 21, 1997, because the interest taken in this instance is the same interest taken by the later zoning change, I would hold that Sheffield is entitled, at most, to begin prejudgment interest on April 21, 1997, on the amount of damages found by the jury. That is to say, under this theory, the taking occurred on the date the moratorium became unreasonable rather than on the date the zoning was changed.[1] Another trial on "damages" is unnecessary.

### DECLARATORY JUDGMENT

Sheffield's point on appeal asserts that a plat submitted during a time the moratorium had expired was deemed approved, as a matter of law, when the city did not act on it within 30 days. Although the point presents a legal question, the majority merely sustains the issue and remands it for further proceedings. Again, no guidance is given on a critical point. Can Sheffield prevail on approval of the plat (thereby gaining the right to develop the property under the former zoning) *and* recover damages for the moratorium and

re-zoning? By affirming the judgment for damages and remanding the declaratory judgment issue, we have set up that possibility.[2]

If we were to determine that the plat was not approved as a matter of law, we could render judgment for the damages found by the jury plus prejudgment interest. If we determined that the plat was approved as a matter of law, the city's issue and all of Sheffield's other issues are moot and judgment would be rendered approving the plat. The only issue left undecided would be whether Sheffield is entitled to attorney's fees and expenses under the Declaratory Judgment Act.

For these reasons, I disagree with the majority's failure to adequately address this issue.

---

1. I disagree with the notion that a "different damage analysis" should apply under these circumstances. The moratorium ultimately resulted in the change in zoning that the jury considered. Had the city not changed the zoning, a different damages analysis would apply to the moratorium period.

2. Sheffield may have to elect which remedy to pursue. The doctrine of "election of remedies" is an affirmative defense that, under certain circumstances, bars a person from pursuing two inconsistent remedies. *See generally Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 850–52 (Tex.1980). Our affirming the judgment for damages could interfere with the city's right to require Sheffield to elect.